Thank you, Your Honor. May it please the Court. My name is Adam Wierzbowski, and I represent the appellant, Municipal Employees Retirement System of Michigan. This is a securities case about how Pier 1 had an enormous backlog of stockpiled, slow-moving inventory that posed a significant markdown risk to Pier 1. However, defendants repeatedly claimed to investors that Pier 1 had no significant markdown risk. Those statements were false, they misled investors, and they artificially inflated Pier 1's stock price. Our position is that Plaintiff has pled the elements of a Section 10b violation and that the dismissal of the case should be reversed. We base our position on three points. First, Plaintiff has pled a case of severe recklessness. Under Fifth Circuit precedent, a Plaintiff may plead a violation of Section 10b through circumstantial evidence of severe recklessness. Here, Plaintiff has pled cogent, compelling, contemporaneous evidence that defendants were aware of a historic backlog of stockpiled inventory. That inventory was in thousands of storage containers in Pier 1's store and distribution center parking lots, and Plaintiff's evidence includes not only circumstantial evidence but direct evidence. Defendants thus— What is your evidence of high markdown risk rather than just high inventory? In the record, I think your expert got stricken. That is correct, Your Honor. As a matter of fact, however, the complaint pleads significant circumstantial evidence that defendants were aware of red flags of actual markdown risk. Those red flags—and I'll go through them in a moment— those red flags included the fact that they were aware of the slow-moving inventory, which is Pier 1's standard for taking markdowns. They admitted internally that Pier 1 had overbought merchandise. Overbought merchandise means simply that there is too much merchandise, not simply that there is a lot of merchandise. And Pier 1 was not hitting its sales goals, and its distribution centers were not quickly processing the inventory. All of this led to significant markdown risk at the company, and defendants were severely reckless to claim otherwise. The second major point that I'll touch upon is that the district court engaged in inappropriate and incorrect fact-finding. It is well established under Supreme Court and Fifth Circuit law that at the pleading stage, the court must accept plaintiffs' well-pled allegations as true and not resolve facts in defendants' favor. Here, the district court repeatedly violated those principles. Third, the defendants have offered no compelling, competing inference of Scienter. My first main point is that the defendant's—pardon—my first main point is that the complaint alleges a case of severe recklessness. Pier 1 is a publicly traded company. The success of Pier 1 depends on its ability to take products, import products from overseas, bring them into the U.S. market, and mark up those products. It's a margin business. Investors are paying attention to Pier 1's margins and its ability to mark up. The risk that Pier 1 might need to take significant markdowns would be a serious threat to Pier 1's margins, and it would threaten its investment value and its stock price. During the class period, defendants repeatedly claimed to investors in public statements that Pier 1's inventory was clean and that it did not present a significant markdown risk. But at the time the defendants made these statements, they were on notice of facts demonstrating significant markdown risk. To understand if defendants' claims were false, we must begin with Pier 1's standard for taking markdowns. So the district court found that Pier 1 repeatedly disclosed its inventory growth, increased costs and expenses, and disappointing sales to investors and analysts. That's just a quote from the record. Is that clearly erroneous? I mean, what was the nature of that finding, or do you agree or disagree with it? Pier 1 did disclose the amount of its inventory in dollar value, the hundreds of millions of dollars of inventory that Pier 1 had accumulated. However, what Pier 1 repeatedly told investors to reassure them that that did not create a problem was that that enormous stockpile of inventory, which was slow moving within the company, that did not pose a significant markdown risk to the company. To make that claim based on what they knew at the time, based on what was happening inside of Pier 1, that was severely reckless. So it wasn't that Pier 1 didn't say enough, it was that it said too much, right?  Pier 1 said too much, that those statements, particularly when they made the statements repeatedly during the class period, including they made the statements four times within the five months from December of 2014 through April of 2015. To make the claim affirmatively to investors that the facts inside the company do not present a case of significant markdown risk, that sort of behavior is severely reckless. It's outside the norm of the ordinary standard of care, and it meets the Fifth Circuit standard of severely reckless behavior. Another prong of the Fifth Circuit standard of severely reckless behavior is that the statements have a risk of misleading buyers. Is that the scienter element? Pardon? Is that the scienter element? That's correct. That's correct. The Fifth Circuit has held that a plaintiff may plead scienter based on either actual knowledge or severely reckless behavior. And within that umbrella of severely reckless behavior, you have the two elements of behavior that's outside the scope of ordinary prudence and then the risk that the statements could mislead buyers. Here, as a matter of fact, the statements did mislead buyers, including our client. The fact is that each time defendants from December of 2014 through April of 2015, each time the defendants came into the market affirmatively and told investors that the high numbers of inventory at the company, the hundreds of millions of dollars of inventory at the company, that is not a problem for investors because, quote, there is no significant markdown risk. The reality is that the inventory did pose that significant markdown risk. And the complaint pleads significant contemporaneous evidence demonstrating that there was markdown risk inside the company. So if, in fact, the company knew that there was the markdown risk, why did it keep ordering inventory? The company kept ordering. There's a few responses to that, Your Honor. The company kept ordering inventory because that is the nature of its business. PeerOne tells investors that its success depends on its ability to predict trends and to satisfy consumer demand in a timely manner. PeerOne is a home furnishings company. The trends in home furnishings are changing constantly. If PeerOne wants to be able to anticipate and meet a trend that it sees coming in the home furnishings space, they need to purchase new inventory and make sure that that's coming down the line. What we're dealing with here and what this case is dealing with here is the inventory that was currently already at the company, the backlog that they already saw, the distribution centers that were in disarray and were in crisis and unable to process the inventory to even bring it to the consumers. That led to them being unable to process seasonal inventory. That led to them incurring significant costs. If I understand you correctly, I'm not trying to put words in your mouth, it wasn't that this inventory was unsellable, it was just that it wasn't being properly processed and delivered? Part of it being not being able to be delivered and processed, that makes the inventory slow moving, and that meets PeerOne's own stated standard for markdowns. If inventory is slow moving, if they have the inventory that is not getting to the consumer, then that satisfies PeerOne's own stated standard in its Form 10-Ks that it states to investors it takes markdowns on slow moving inventory. The inventory wasn't selling, that's part of it, because the company wasn't meeting its sales goals. The company had overbought inventory. Defendant Smith admitted that internally in March 2014. He didn't publicly admit that until September 2015. Then in addition, all of the overbuying and the failure to meet sales goals, that caused this significant disruption within the distribution centers and the stores. I see a contradiction there, and I'm raising the question so you can give us a good answer. But if there are stores that are waiting for inventory that the stores can't get, then that assumes that that inventory, once it arrived, would be able to be sold at prices that weren't at some sort of dramatic markdown. So how can you have at one and the same time excess inventory on hand that has to be marked down and inventory that hasn't arrived yet at the stores that ordinarily would sell? In terms of the demand that the stores were pulling inventory, the complaint actually pleads that the stores were pushing back and telling headquarters that they did not want more inventory. The stores themselves were overwhelmed with excess inventory. So how was there a problem then with the distribution chain? I thought you were referring to that earlier, that there were problems with getting the goods delivered to the stores. If I misunderstood, clear it up for us. Absolutely. So the distribution chain includes Pier 1 taking the products from overseas. They're in giant tractor-trailer-sized shipping containers. Under an ideal situation, Pier 1 unloads those shipping containers into the distribution centers. Then the distribution centers get those products out to the stores and to the consumers who are buying things online. The problem here is that during the class period, each element of that chain were significantly disrupted by the fact that the company had overbought inventory. Defendant Smith admitted that during the class period, during the March 2014 internal town hall meeting, that the company had been overly ambitious and they had overbought inventory. Does your record show what percentage is going to retail outlets and what is being bought directly by consumers? I don't believe that the complaint includes that allegation, but at the end of the class period, what the defendants admitted was that the markdowns that they eventually took was the result of the fact that they had overbought inventory. And we have accounts from former employees who state that the company overbought inventory across the board. That's the words they used. So across the board, whether or not it's the e-commerce or whether or not it's the store inventory, they overbought that. And in addition, at the March 2014 internal town hall meeting, Smith admitted that One Peer One's e-commerce initiative, I'm sorry, that Peer One's e-commerce initiative, which is called One Peer One, that initiative had been overly ambitious and that that initiative had led to the overpurchase of products. So as of right before the beginning of the class period, Defendant Smith is admitting to his own employees, we bought too much product. This includes e-commerce sales. This includes the products that we bought for the stores and the e-commerce initiative. So as a whole, across the company, the company has overbought too much inventory. I have two questions. Doesn't high inventory only apply high markdown risk if the high inventory can't be sold slowly at the market price? And so how does the pleading show that Peer One executives knew that they could not do that? That's the first question. And then the second question is, can we affirm on the alternative ground that there's not an actual misrepresentation in this record? And if that's true, then what is the misrepresentation that you believe is there? Those are two very different questions. I'll take the first question first. The idea that the company could simply sell off the large amount of inventory through sales is contradicted by the fact that throughout the class period, the company was not meeting its own internal sales goals. But that the executives knew enough to say it's a high markdown risk? Yes. Because they didn't meet the sales goals, that's the reason? The reason was, among other reasons I mentioned in terms of the problems in the distribution centers, the company didn't just miss the sales goals once or twice. As of the beginning of the class period, the defendant Smith admitted they had overbought inventory. And then throughout the class period, quarter after quarter, defendant's brief even has a chart showing this, and they admit this in a footnote. Quarter after quarter, the company was missing its sales goals. And internally at the company, by early 2014, this is paragraph 179B of the complaint, daily sales data sent to Smith and Turner showed Pier 1 could not meet its aggressive sales goals for 2014. At quarterly business review, Smith and Turner became aware multiple times of the disparity between the growing inventory and the fact they were having disappointing sales. The company also set internally a limit on the amount of markdowns that it could take called markdown dollars, and they didn't tell that to investors. Because what they wanted to do was meet the margin numbers that Wall Street had for them. I see that my time is up. Would you like me to answer the second question? You can go ahead and answer the second question, and then you can have two more minutes if you'd like. Okay. Your Honor, your second question was, if you could just— Can we affirm on alternate grounds that there's no actual misrepresentation? I think that the judge spotted you that there's the misrepresentation and then went on this other route. Correct. Judge Fitzwater held, well, in his opinion, he assumed for the sake of argument that we had adequately alleged falsity. And the defendant's arguments on falsity, they don't— What's the best one that shows us this is not the right way to go? If we were inclined, assuming argumento, to affirm on this alternative ground, tell us why we can't do that. Tell us which one is there as a misrepresentation, as falsity, that's clear as day that would tell us don't go down this route. The fact that the defendants repeatedly, at least four times during the class period, said there's no significant markdown risk at the company. Markdown risk is critically important to Pier 1 investors. The Fifth Circuit's decision in Lorman held that a company's understatement of a known risk, it basically—you can't understate a known risk. If a company is aware of a serious risk, the company can't understate it. And this isn't a case where the company simply withheld information from the market. The company affirmatively went into the market to assure investors that the inventory was not a problem, that the missing sales goals weren't a problem, and they didn't see any significant markdown risk. Just the next month after the last statement on that issue, just the next month, they marked down everything at the company by up to 50% off. Those facts don't square with each other. If there's anything else that you want to cover in your opening, any other issue, you can have a minute to do that. You can have an additional minute if there's something else that you haven't covered. If not, you still have your full five minutes for rebuttal. So it's up to you. I think I'll use the additional minute to just highlight the fact that the district court improperly resolved fact questions at the pleading stage. Pier 1 standard for taking markdowns is whether or not there's slow-moving inventory. Plaintiff has pled cogent, compelling evidence that there was slow-moving inventory and the defendants were aware of it.  It's a hold that defendants needed to be aware of excess seasonal or obsolete inventory. That's not Pier 1's own standard. And when the district court did that, it informed the district court's holding on a number of the other scienter points. The district court also held, for example, that Pier 1 could have been prioritizing the product and making sure that even though it's in the backlog, it would take out the seasonal product and prioritize that and make sure that got to the market. But there's no facts to support that that actually happened here. At the end of the class period, the company marked down, well, in May 2015, the company marked down everything by up to 50% off. Not just seasonal, not just obsolete, not just outdoor products, which is their additional pretext explanation they offer now. It's not just about those specific categories of merchandise. The company overbought across the board. They had too much inventory. It was a crisis. That's what happened here. All right. Thank you, Mr. Ryczkowski. Thank you. You've saved your full five minutes for rebuttal. Thank you. Mr. Crane. Thank you, Your Honor. Good morning, and may it please the court, my name is Stephen Crane. I represent Pier 1, Alex Smith, and Kerry Turner. Judges Fitzwater and Scholar got the case right. Appellant has not sufficiently pled scienter to sustain a securities fraud case in this circuit or in any circuit for that matter. Subject to the court's direction, I'm going to spend much of my time talking about the specific scienter allegations made by appellant, focusing on specific statements made to or by Alex Smith. I note that on appeal, Kerry Turner, the former CFO, is not mentioned. There are no allegations about Kerry Turner. Well, the company did at one point say that the situation, quote, did not pose a significant immediate markdown risk. Is that an accurate representation of the record? That is an accurate representation in the record. That's a pretty strong statement that supports the plaintiff's position, it seems to me. Well, Your Honor, if we focus on, for example, the April 8th, 2015 statement, the Smith statement that they're now saying is the misrepresentation they're relying upon, what Alex Smith actually says is that the inventories are healthy and not believed to pose a substantial markdown risk. Turning to Judge Elrod's question, it is inherently a- Well, so the argument is that that was severe, even if it was not intentionally false, that it was severe recklessness. That it was severely reckless for him to have said that, correct. So the severe recklessness standard, as the Court is aware, is a very, very high standard, and the Court has illuminated what that standard means in Neiman. In Neiman, the situation was the CFO made representations about a particular well, well number four, and the production of well number four at 7,000 barrels a day, which accounted for 22% of the company's overall production. He made that representation for two months, and then a couple months later revealed that the well was only producing at 3,500 barrels a day. In the interim, there were allegations that he had received reports from confidential witnesses indicating that his representations were wrong. And in that case, under those facts, the Fifth Circuit did not find the severe recklessness standard had been met. If you juxtapose those facts with our facts, what you find is you have the CEO of Pier 1 stating to the investors that having cleared out seasonal inventory, he thought the inventories were healthy and they didn't see substantial markdown risk. And there's a point there on the substantial markdown risk. I don't know what substantial markdown risk is. I don't know if it ever occurred. What I do know is that by the end of the class period, the margin on products sold remained at over 55% and was only down by 2% from the prior year. So I don't know if there's any compelling allegation that substantial markdowns ever actually occurred. In this context, I'll skip ahead. And why did they have to have those markdown dollar internal thing if there wasn't a risk? Why isn't that some sort of evidence that they perceived a risk? Are you referring to markdown meetings? Well, I think that it is that there are a start. Let me back up. Pier 1 discloses that part of what it does is sells things at markdowns. You can't drive by Pier 1 where you don't see things for sale at Pier 1. That's part of what they do. And, in fact, Judge Fitzwater cited earlier comments from earnings calls where Pier 1 indicates that its business model is based upon selling things at promotional discount, half of the products at promotional discounts and half at regular prices. So the specific markdown meetings that you're referencing, Judge Elrod, were, as alleged, markdown meetings in which, supposedly, the individual defendants were aware that there were constriction placed on the types of markdowns that can be taken. Well, that's just part of their ordinary business. It wasn't in response to any kind of crisis pending? No, there's no allegation whatsoever that that's not part of their ordinary business, and, in fact, it is. So I want to talk very quickly about, or as quickly as I can, about motive, because where we are today is that the plaintiffs are asserting a circumstantial case based on a recklessness standard without any evidence of motive. So there's no stock sales. There's nothing, no transactions, no financings during the class period, nothing of the sort of thing that even this court looks skeptically at in terms of serving as motive. In fact, the record tells the opposite story. Throughout the class period, Alex Smith maintained his sizable stock position. The most recent iteration of the plaintiff's motive allegation is that the EBITDA targets at Pier 1 were lowered, and that gave Alex Smith a greater chance of achieving his bonus. And then they rely upon the court's ruling in Berry for the proposition that occasionally incentive compensation can serve as evidence of motive. So Berry's very different, very different circumstances. 175% of his salary that he was able to achieve, and even then the court said that's not enough to get you to scienter. It has to be tied to other facts. In that case, there were facts alleged that the CEO who received the bonus based on the revenues of the company was aware that his actions were improper, and he was fraudulently booking revenues. Smith received no compensation during incentive compensation during the class period. And I think I have this right. Even in every case where you all say, where the court has said, excuse me, where the court has said incentive compensation may serve as motive, incentive compensation has been awarded. I can find no Fifth Circuit case where there's a possibility of incentive compensation that's not achieved and that serves as motive. What's more, plaintiff can't explain how lowering the EBITDA target in any way helped Smith achieve it. After all, the allegations are that Smith and Peer 1 continued to purchase inventory while selling off inventory at discounts, and that's going to have the absolute opposite effect on EBITDA. I just want to just make sure that I have this correct, that when the senior executives limited the total amount of markdown dollars Peer 1 took at any given time, that was a normal day-to-day business occurrence. It is, Your Honor, and there's no allegations to suggest otherwise. What's more, there's no allegations that specifically identify any act by Smith or Turner. There's no allegation, in fact, that Smith or Turner are at that meeting. That's a group pleading allegation that is not specific, that it certainly does not rise to the standard required for confidential witnesses of identifying who said it, where it was said, and tying it with particularity to the wrongful speaker in this case, the electoral wrongful speaker in this case, Mr. Smith. And that's the same thing for prohibited employees from exceeding their department-specific markdown caps. There's no allegation there that suggests that in Paul Smith or Turner anyway, there's no direct tie of that to the defendants, and that's required under the high standard set by this Court and other courts regarding whether you can rely upon confidential witnesses as a basis of scienter. Do you want to speak to the city of Pontiac case versus Dell? Sure. So in Pontiac versus Dell, I'm sure I have all my cases in front of me, what was represented was that Dell expected revenues to be in line with projections, and they missed it by a half billion dollars. So it's a massive, massive, massive miss. And the allegations in that case were that Dell had in its warehouses stores of high-end computers, and this was at a point in time when the world shifted from very expensive high-end laptops and desktops to a cheaper computer. And the evidence in that case was that the defendants, because the revenues were going to be in line with the expectations, were aware that the market had shifted away from their products, which is very, very different from Pier 1. Pier 1 discloses, as the Court is aware, Pier 1 discloses that it has products that it buys year after year and sells year after year, and the dining room chairs and dining room tables and pop-scene chairs and things of that nature. If I can, I'm going to turn to this issue of whether the courts below found facts. It's not overstatement, and in particular, the issue that appellants have taken with the findings of Judge Schoeller is that Pier 1 is not a trend-based fashion retailer. So at the end of the first round of the case, the problem that the plaintiffs had was that Judge Fitzwater pointed out that in the mix of Pier 1's inventory, half of it is rebuy goods, tables and chairs that they order year after year and they sell year after year. And his suggestion, based upon the disclosures of Pier 1 and the fact that Pier 1 was, during the class period, able to moderate its purchases and lower the inventory, that is, those goods are not inherently subject to markdown risk. You can just warehouse them and trot them out as the stores need them. So there's an invention in the second complaint, and the invention is that Pier 1 is a trend-based fashion retailer, and Judge Schoeller found that that was a conclusory allegation and did not find that it was a reasonable inference. Now, it's not overstatement to say that Appellant's case really rises and falls on the notion that we are a trend-based fashion retailer. That's the only way they can say to you that all of our products, when stored, are inherently subject to markdown risk because they have to ignore the mix of inventory. That is to say, they have to ignore that we have tables that we sell year after year. The court's obligation, as you know, is to consider other plausible non-culpable explanations when determining whether Appellant has pled cogent and compelling scienter allegations. The court's hands are not tied behind its back. The court will not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions, and in making those determinations, the court is not limited to what's typed in the complaint. The court can consider the full text of documents to avoid cherry-picking. As Judge Harmon has noted, the court cannot fulfill its gatekeeping role if plaintiffs are free to quote selectively or out of context from documents. This court has also noted recently that public disclosure documents required by law that have been filed with the SEC and documents that the plaintiff either possessed or knew about are also fair game for a court on a motion to submit without turning it into a motion to summary judgment. So even the case cited by Appellants from the Ninth Circuit, cogent versus orexogen, I think, supports the analysis undertaken by the courts below. There, the Ninth Circuit wrote, the incorporation by reference doctrine exists to prevent plaintiffs from selecting only portions of documents that support their claims while omitting portions of those very documents that weaken or doom their claims. Now, with that in context, I want to show what the plaintiffs have done here. Appellant wants you very much to rely upon a statement by Laura Coffey on April 8th. So there are two statements on April 8th, one by Alex Smith, one of our defendants, that they rely upon about him saying that, given the inventories, they are not believed to pose a substantial markdown risk. Well, Laura Coffey says this. The complexion of our current inventories healthy is level and does not pose a significant immediate markdown risk. Judge Smith, that's where the significant immediate markdown risk occurs. It's both on the same phone call. Okay, so she says the complexion of our current inventories is healthy, and they want you very much to rely upon that as the representation that there's no markdown risk. But Appellant very much wants to avoid the very next sentence that Ms. Coffey says. Approximately half of our inventory is comprised of new and seasonal SKUs, including outdoor, while the remaining 50% is comprised of longstanding collections of our products that do well for us day in and day out. They want you to skip over that part because it doesn't fit with the new invention that everything we have is trend-based. The comment is, in fact, I think poison to their claim that Pier 1 is a trend-based fashion retailer. Compare what she said, Ms. Coffey said, about the product mix with the conclusory allegations. This one's from page 7 of their reply brief. Trend-based fashion retailer is simply shorthand for the very words Pier 1 used to describe itself. Or this one from page 57 of their brief. Pier 1 is a trend-based fashion retailer as Pier 1 described itself. Well, Pier 1's never described itself as a trend-based fashion retailer. In fact, no one has. They don't have an allegation of anybody who's ever said that they're a trend-based fashion retailer. They identify statements where we say part of what we buy is based on trends and we're hoping to be in fashion. But that doesn't convert us into a trend-based fashion retailer like Ann Taylor in the Novak case where you have clothes that go stale and become obsolete. That's not what we are. Papasan chairs, for example, unless I'm just wrong about this, have not been trendy since, call it 1960. But they sell them year after year after year. So we're not a trend-based fashion retailer. The last big area I want to cover before touching on Scientia if I have time is the notion that we had a big revealing moment in May of 2015. So plaintiffs juxtaposed the April 8th statement, not believed to pose a substantial markdown risk, and they say all of this is borne out and revealed to be a lie at the end of May, May 31st, when there's a sale of 50% off of everything. Council just said that. That's not what those ads said. Judge Schoeller took judicial notice of the ads. The ads are in the record. The ads say, and by the way, the sale ends on that same day, up to 50% off on everything. And then if you look in the margins, sort of upper left side, you'll see that there's a very specific limit on indoor seating that is only at 15% off, and then a parenthesis underneath that that says excluding dining seating. So the notion that we had a fire sale as opposed to simply a promotion to drive sales is unwarranted. What's more, if you take that sale and the next sale where it was 60% off and the next sale where it's 70% off during the summer, summer sales, well, if the plaintiffs are right, and that is the moment where we reveal that we have to get rid of all our inventory and that we are so burdened by this massive amount of inventory that we just have to sell it at rock-bottom prices, where's the impact on margin, product margin? Product margin, and the world knows this, Pier 1 sells at a high product margin, and they maintained about a 55% margin versus 57% the year before. So where is this moment where these massive markdowns, which gets me back to the point I was making earlier on, I'm not sure substantial markdowns ever occurred. I don't think there's any suggestion that they actually ever, ever occurred. How do you account for the huge drop in stock? That's a great question, Judge Wiener. So the huge drop in stock follows news of adjustment in guidance for the following year. So Pier 1 has disappointing sales. They report disappointing sales, and then they adjust their guidance for the following year, and their guidance for the following year is lower than had previously been indicated, and that's what causes your stock to drop. There's no question, because all of this is revealed in our public filings, that Pier 1 disclosed every quarter, without restatement, rising inventory, and it also disclosed lagging sales. And so there's no question but that during this period, Pier 1 was in a phase where it was projecting more sales than it was achieving, but that's not to suggest that there wasn't a basis for assuming that the sales would continue to improve. Pier 1 sales during the class period are actually ticking up until right at the very end where they get flat. They actually tick up. They just don't tick up as much as Pier 1 anticipated them to tick up. And the reaction, and this is all in the record and all in the briefing, the reaction by Pier 1 is to then moderate its purchases for future goods so that its inventory level and sales levels can get parallel again. And that's what Smith says at the end of the happens at the end of the class period. Summer sales? Yes, ma'am. Were those the normal summer sales, or were those special summer sales, extra ones, or does the record say anything about that? The record doesn't say either way, and I had a temptation to say, hey, look at all these other ads by Pier 1, but it seems so obvious, and I did in the briefing at the lower courts, tempted to do it, but it seems like I was injecting a fact question. But given what Pier 1 routinely discloses, and that is that it sells goods on a promotional basis and on a discount basis as a routine part of its business, it's only safe to assume that that was simply a typical sale of a retailer like Pier 1 or Pottery Barn or whatever that has significant sales from time to time to drive people to the stores. If there's another point you wanted to cover, I think there was. You can have two more minutes. If not, you don't have to. Your Honor, I don't. All right. Mr. Ryzbowski, rebuttal. Thank you, Your Honors. I just want to start with the last point that was covered as to whether or not these sales were out of the ordinary. They certainly were out of the ordinary, and the facts, as we've pled in the complaint, demonstrate that that was the fact. In September of 2015, Pier 1 disclosed the markdowns and reduced its fiscal 2016 guidance by 26%. It attributed this to the fact that Pier 1 had overbought inventory and the fact that it had to take markdowns. Smith said that the markdowns were self-inflicted and the area of greatest challenge has been merchandise margin. He's focused on margin because the analysts and investors are focused on margin. Let's talk about the specific amount of margin. The margin went down from 59.5% to 55.7%. Sure, that is still a high margin, but investors are focused on Pier 1's ability to generate high margins now and into the future. That was a 3.8% decrease. In the Ross v. Abercrombie case, it was a 1.8% decrease. That complaint was sustained. But more importantly, what emerged from what the defendants told the market in September and December of 2015 was that these markdowns from the summer of 2015, where they were marking down by up to 50%, up to 60%, up to 70%, these were just the tip of the iceberg. They said in December of 2015, on a really historical level, we've still got more clearance inventory than we used to have and we're at the very, very early stages of this process. That's paragraph 170 of the complaint. They just took an entire summer of markdowns that impacted their margins. Now it's December and they're still needing to take markdowns. And they're saying that they're just at the beginning of this process. Okay, while you still have time, so address the point that Mr. Crane made about his assertion that Pier 1 never described itself as a trend-based fashion retailer but that you seem to have described it that way. The phrase trend-based fashion retailer, in quotes, we don't allege that anyone actually ever said Pier 1 is, in fact, a quote, trend-based fashion retailer. What we allege in the complaint is that Pier 1 told its investors repeatedly that our business depends on our ability to meet current trends and do that in a timely fashion. They say that in their Form 10 case where they're describing to the SEC and the investors what is the nature of their business. They're a home furnishings business. They have to meet trends. They also make statements about the fact that the company needs to meet fashion trends. Defendants are splitting hairs. And the fact of the matter is that's really what happened here. Just to talk quickly about the markdown meetings that were discussed and the markdown dollars. The complaint alleges that Pier 1 had this policy of limiting markdown dollars. The complaint also alleges that Defendants Smith and Turner, this is in paragraph 179I of the complaint, Smith and Turner attended the markdown meetings. The company has a policy in place to limit markdowns with these markdown dollars. The reasonable inference is that during these markdown meetings, which Defendants Smith and Turner personally attended, they were discussing the limits, the markdown dollars. It is not plausible that lower-level employees would contradict what the CEO and the CFO said in terms of markdowns and say, well, no, we have this hidden unknown markdown dollar policy. We're going to limit the senior executives' decisions. The senior executives were in control of the markdown process. They were at the meetings. And this is the company's policy to limit the markdown through markdown dollars. The City of Pontiac v. Dell case, that is directly on point with our case in the sense that it involved stockpiling inventory and inventory lags, which the court held supported a strong inference of Scienter. In terms of the statements in the complaint, there were numerous false statements about markdown risk. The Defendants also made statements about the fact the company was in the best shape strategically it's ever been and that it had clean inventory. On the issue of what facts the court may consider on a motion to dismiss, under Tell Labs, the court is permitted to consider competing inferences of Scienter. But the universe of facts that the court may use to rely upon are the facts alleged. That's what the Supreme Court said in Tell Labs. It has to be based on the facts alleged. That includes things that the court may take judicial notice of.